# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| DIXIE A. SMITH, Individually and as Spouse and Next Friend of JAY CHRISTOPHER SMITH, Deceased, | )<br>)<br>)  MDL No. 2592<br>) |
| Plaintiffs, | )  SECTION: L<br>)  JUDGE FALLON<br>)  MAG. JUDGE NORTH |
| v. | ) |
| JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC; JOHNSON AND JOHNSON; JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC.; JANSSEN ORTHO LLC; BAYER HEALTHCARE PHARMACEUTICALS, INC.; BAYER PHARMA AG, f/k/a BAYER SCHERING PHARMA AG; BAYER CORPORATION; BAYER HEALTHCARE LLC; BAYER HEALTHCARE AG; BAYER AG; and JOHN DOES 1-5, | )<br>)<br>)  COMPLAINT AND JURY<br>)  DEMAND<br>)<br>)  CIVIL ACTION NO: 2:15-cv-1734<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

COMES NOW the Plaintiff, by and through the undersigned counsel, and hereby submits this

Complaint against Defendants Janssen Research & Development, LLC f/k/a Johnson and Johnson

Pharmaceutical Research And Development LLC; Johnson and Johnson; Janssen Ortho, LLC;

Janssen Pharmaceuticals, Inc. f/k/a Janssen Pharmaceuticals Inc., f/k/a Ortho-McNeil-Janssen

Pharmaceuticals, Inc.; Bayer Healthcare Pharmaceuticals, Inc.; Bayer Pharma AG; Bayer

Corporation; Bayer Healthcare, LLC; Bayer Healthcare AG; Bayer AG, and John Does 1-5,

(hereinafter collectively "Defendants") for equitable relief, monetary restitution, and compensatory

and punitive damages, arising from the injuries and death of Decedent as a result of his exposure to the pharmaceuticals product Xarelto ® and is hereby alleges as follows:

## PARTIES

1.      Decedent Jay Christopher Smith (hereinafter "Decedent") at all times relevant hereto, was a resident and citizen of the State of Missouri.  Decedent suffered injuries, damages and death as a direct result of his ingestion of the Pharmaceuticals product Xarelto®.

2.      Plaintiff Dixie A. Smith, at all times relevant hereto, was, and currently is, a resident and citizen of the State of Missouri.  Plaintiff Dixie A. Smith is the spouse and natural heir of Decedent (hereinafter "Successor Plaintiff").  Plaintiff Dixie A. Smith seeks damages for pain and suffering as a result of her husband's death, as well as reimbursement of costs for all past and present health and medical care costs related to Xarelto®, such as medical bills, economic losses and attorneys' fees.

3.      Upon information and belief, Defendant JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC (hereinafter referred to as "JANSSEN R&D") is a limited liability company organized under the laws of New Jersey, with a principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933. Defendant JANSSEN R&D's sole member is Janssen Pharmaceuticals, Inc., (Centocor, Inc. [now known as Janssen Biotech, Inc.], a Pennsylvania corporation with its principal place of business and nerve center located at 200 Great Valley Parkway, Malvern, Pennsylvania.), which is a Pennsylvania corporation with a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560.  Accordingly, JANSSEN R&D is a citizen of Pennsylvania and New Jersey for purposes of determining diversity under 28 U.S.C. §1332. Defendant JANSSEN

R&D is the holder of the approved New Drug Application ("NDA") for Xarelto as well as the supplemental NDA.

4.     As part of its business, JANSSEN R&D is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

5.     Upon information and belief, Defendant JANSSEN R&D has transacted and conducted business in the State of Missouri and the State of Louisiana.

6.     Upon information and belief, Defendant JANSSEN R&D has derived substantial revenue from good and products used in the State of Missouri and the State of Louisiana.

7.     Upon information and belief, Defendant, JANSSEN R&D, expected or should have expected its acts to have consequence within the United States of America and the State of Missouri and the State of Louisiana, and derived substantial revenue from interstate commerce within the United States and the State of Missouri and the State of Louisiana, more particularly.

8.     Upon information and belief, and at all relevant times, Defendant, JANSSEN R&D, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

9.     Defendant JOHNSON & JOHNSON (hereinafter "J&J"), is a fictitious name adopted by Defendant JOHNSON & JOHNSON COMPANY, a New Jersey corporation which has its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex

County, New Jersey 08933.  At all times relevant herein, Defendant JOHNSON & JOHNSON was engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Xarelto®.

10.    Defendant Janssen R & D is the holder of the approved New Drug Application ("NDA") for Xarelto®, as well as the supplemental NDA. Janssen R & D, Johnson & Johnson and Centocor all transact substantial business within the state of Louisiana and throughout the United States, including the research, manufacture, sale, distribution and marketing of Xarelto®, as set forth herein.

11.    Upon information and belief, Defendant JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (hereinafter referred to as "JANSSEN PHARM") is a Pennsylvania Corporation, having a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560.

12.    As part of its business, JANSSEN PHARM is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

13.    Upon information and belief, Defendant, JANSSEN PHARM has transacted and conducted business in the States of Missouri and Louisiana.

14.    Upon information and belief, Defendant, JANSSEN PHARM, has derived substantial revenue from goods and products used in the States of Missouri and Louisiana.

15.    Upon information and belief, Defendant, JANSSEN PHARM, expected or should have expected its acts to have consequences within the United States of America, the States of Missouri and Louisiana, and derived substantial revenue from interstate commerce within the United States and the States of Missouri and Louisiana, more particularly.

4

16.     Upon information and belief, and at all relevant times, Defendant, JANSSEN PHARM, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

17.     Upon information and belief, Defendant JANSSEN ORTHO LLC (hereinafter referred to as "JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal place of business at Stateroad 933 Km 01, Street Statero, Gurabo, Puerto Rico 00778. Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson. The only member of JANSSEN ORTHO LLC is OMJ PR Holdings, which is incorporated in Ireland with a principal place of business in Puerto Rico. Accordingly, JANSSEN ORTHO LLC is a citizen of Delaware, Ireland and Puerto Rico for purposes of determining diversity under 28 U.S.C. § 1332.

18.     As part of its business, JANSSEN ORTHO is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.  Upon information and belief, Defendant, JANSSEN ORTHO has transacted and conducted business in the States of Missouri and Louisiana, and derived substantial revenue from goods and products used in the States of Missouri and Louisiana.

19.     Upon information and belief, Defendant, JANSSEN ORTHO, expected or should have expected its acts to have consequence within the United States of America and the States of Missouri and Louisiana, and derived substantial revenue from interstate commerce within the United States and the States of Missouri and Louisiana, more particularly.

5

20.     Upon information and belief, and at all relevant times, Defendant, JANSSEN ORTHO, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

21.     Upon information and belief, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC., f/k/a Berlex Laboratories, Inc., f/k/a Berlex, Inc. is, and at all relevant times was a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of New Jersey, and is the same corporate entity as Berlex, Inc. and Berlex Laboratories, Inc.

22.     As part of its business, BAYER HEALTHCARE PHARMACEUTICALS, INC. is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

23.     Upon information and belief, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., has transacted and conducted business in the States of Missouri and Louisiana, and has derived substantial revenue from goods and products used in the States of Missouri and Louisiana.

32.     Upon information and belief, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., expected or should have expected its acts to have consequence within the United States of America and the States of Missouri and Louisiana, and derived substantial revenue from interstate commerce within the United States and the States of Missouri and Louisiana, more particularly.

6

33.     Upon information and belief, and at all relevant times, Defendant, BAYER

HEALTHCARE PHARMACEUTICALS, INC., was in the business of and did design,

research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use

as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic

embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of

recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee

replacement surgery.

34.     Upon information and belief, Defendant BAYER PHARMA AG, f/k/a Bayer

Schering Pharma AG, is a pharmaceutical company domiciled in Germany and is the same

corporate entity as Bayer Schering Pharma AG.  Bayer Schering Pharma AG is formerly known as

Schering AG and is the same corporate entity as Schering AG.

35.     Upon information and belief, Schering AG was renamed Bayer Schering Pharma AG

effective December 29, 2006.

36.     Upon information and belief, Bayer Schering Pharma AG was renamed BAYER

PHARMA AG effective July 1, 2011.

37.     As part of its business, BAYER PHARMA AG is involved in the research,

development, sales, and marketing of pharmaceutical products including Xarelto and

rivaroxaban.

38.     Upon information and belief, Defendant, BAYER PHARMA AG, has transacted and

conducted business in the States of Missouri and Louisiana, and has derived substantial revenue

from goods and products used in the States of Missouri and Louisiana.

39.     Upon information and belief, Defendant, BAYER PHARMA AG, expected

or should have expected its acts to have consequence within the United States of America and the

States of Missouri and Louisiana, and derived substantial revenue from interstate commerce within

the United States and the States of Missouri and Louisiana, more particularly.

40.     Upon information and belief, and at all relevant times, Defendant, BAYER

PHARMA AG, was in the business of and did design, research, manufacture, test, advertise,

promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary

purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-

valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE,

and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

41.     Upon information and belief, Defendant BAYER CORPORATION is an Indiana

corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

42.     Upon information and belief, Defendant BAYER CORPORATION is the sole

member of BAYER HEALTHCARE LLC, which owns 100% of Schering Berlin, Inc., which owns

100% of Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC.   As such, Defendant

BAYER CORPORATION is a parent of Defendant BAYER HEALTHCARE

PHARMACEUTICALS, INC.

43.     At relevant times, Defendant BAYER CORPORATION was engaged in the

business of researching, developing, designing, licensing, manufacturing, distributing, selling,

marketing, and/or introducing into interstate commerce, either directly or indirectly through third

parties or related entities, its products, including the prescription drug Xarelto.

44.     At relevant times, Defendant BAYER CORPORATION conducted regular and

sustained business in the States of Missouri and Louisiana, by selling and distributing its products in

the States of Missouri and Louisiana and engaged in substantial commerce and business activity in the States of Missouri and Louisiana.

45.     Upon information and belief, Defendant BAYER HEALTHCARE LLC is a limited liability company duly formed and existing under and by the virtue of the laws of the State of Delaware, with its principal place of business located in the State of New York. BAYER HEALTHCARE LLC's sole member is Bayer Corporation, and is wholly owned by Bayer Corporation, which is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205. Accordingly, BAYER HEALTHCARE LLC is a citizen of Delaware, New York, Indiana and Pennsylvania for purposes of determining diversity under 28 U.S.C. § 1332.

46.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC has transacted and conducted business in the States of Missouri and Louisiana, and derived substantial revenue from interstate commerce.

47.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC expected or should have expected that its acts would have consequences within the United States of America, in the States of Missouri and Louisiana, and derived substantial revenue from interstate commerce.

48.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

49.     Upon information and belief, Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent/holding company of Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC, and BAYER PHARMA AG.

50. Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG has transacted and conducted business in the States of Missouri and Louisiana, and derived substantial revenue from interstate commerce.

51.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG expected or should have expected that its acts would have consequences within the United States of America, and in the States of Missouri and Louisiana, and derived substantial revenue from interstate commerce.

52.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG exercises dominion and control over Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER PHARMA AG.

53.     Upon information and belief, Defendant BAYER AG is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany, and is the third largest pharmaceutical company in the world.

54.     Upon information and belief, and at all relevant times Defendant BAYER AG is the parent/holding company of all other named Defendants, and at all relevant times, Defendant BAYER AG has transacted and conducted business in the States of Missouri and Louisiana, and derived substantial revenue from interstate commerce.

10

55.     Upon information and belief, at all relevant times, Defendant BAYER AG expected or should have expected that its acts would have consequences within the United States of America, in the States of Missouri and Louisiana, and derived substantial revenue from interstate commerce.

56.     Upon information and belief, at all relevant times, Defendant BAYER AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

57.     Upon information and belief, Defendants John Does 1-5 are corporations or other legal entities, the names and addresses of residences of which are unknown.

58.     At all times alleged herein, Defendants shall include any and all named or unnamed parent companies, parent corporations, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and any organizational units of any kind, their predecessors, successors, successors in interest, assignees, and their officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.

59.     At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessor in interest, aider and abettor, co-conspirator, and joint venturer of each of the remaining Defendants thereby operating and acting with the purpose and scope of said agency, service, employment, partnership, conspiracy and joint venture.

60.     At all times relevant and material hereto, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and or

introducing into interstate commerce throughout the United States and in the State of Louisiana, either directly or indirectly, through third-parties, subsidiaries and/or related entities, the anti-coagulant Pharmaceuticals Xarelto®.

## JURISDICTION AND VENUE

61.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to the Plaintiffs exceeds $75,000.00, exclusive of interest and costs, and because Defendants are incorporated or have their principal places of business in states other than the state in which the named Plaintiff resides.

62.     This Court has jurisdiction over the non-resident Defendants because they have done business in the State of Louisiana, have committed a tort in whole or in part in the State of Louisiana, and have continuing contacts with the State of Louisiana.

63.     Venue in this district for pretrial proceedings is proper because the United States Judicial Panel on Multi-District Litigation issued a Transfer Order *In Re:  Xarelto (Rivaroxaban) Products Liability Litigation* to centralize this litigation in the Eastern District of Louisiana, MDL 2592, and pursuant to Pre-Trial Order No. 9 entered on March 24, 2015 in *In Re:   Xarelto (Rivaroxaban) Products Liability Litigation*.

## NATURE OF THE CASE

64.     Defendants, directly or by and through their agents, apparent agents, servants or employees designed, manufactured, marketed, advertised, distributed, promoted, labeled, tested and sold Xarelto® as an anti-coagulant primarily used to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat deep vein thrombosis ("DVT"), to treat pulmonary embolisms ("PE"), and/or to reduce the risk of recurrence of DVT and/or PE.

65.     Defendants applied for an initial NDA for Xarelto® in July of 2008.

12

66.     Xarelto® was approved by the Food and Drug Administration ("FDA") on July 1, 2011 to reduce the risk of blood clots, DVT, and PE following knee and hip replacement surgery. On November 4, 2011 Xarelto® was approved as an anti-coagulant primarily used to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation.

67.     On November 2, 2012 the FDA expanded the use of Xarelto® to the treatment of patients with DVT and PE, as well as long-term treatment to prevent recurrence of the same.

68.     According to the Defendants' marketing and informational materials, referenced in the paragraphs below, and widely disseminated to the consuming public, "Xarelto® is the first and only once-a-day prescription blood thinner for patients with AFib not caused by a heart valve problem, that is proven to reduce the risk of stroke -- without routine blood monitoring."[1]

69.     As the Defendants state on their website, "XARELTO® has been proven to lower the chance of having a stroke if you have atrial fibrillation (AFib ), not caused by a heart valve problem.  XARELTO® is an anticoagulant, or blood-thinning medicine that works by helping to keep blood clots from forming."

70.     The Defendants further claim that "it's been prescribed to more than seven million people around the world to help treat or reduce their risk of dangerous clots" and that it "begins working a few hours after you start taking it, and keeps working for as long as take it."[2]

71.     Defendants further declare that "XARELTO® is proven to help treat and prevent DVT and PE blood clots" and that Xarelto® "reduc[es] the risk of these dangerous clots [from]

---

[1]http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM357833

[2] http://www.xarelto-us.com/how-xarelto-works

13

happening again."[3]

72.     Defendants claim that patients with AFib, DVT, or PE taking Xarelto® do not need regular blood monitoring and there are no known dietary restrictions.  In addition, patients with AFib only need to take Xarelto® once a day with an evening meal.[4]

73.     Defendants claim that patients with AFib are 5 times more likely than a person without Afib to suffer from a stroke and that "disability is more likely to be severe" and "the outcome is almost twice as likely to be fatal" and "the chances of having another major stroke go up."[5]

74.     Rivaroxaban is an oxazolidinone derivative optimized for inhibiting both free Factor Xa and Factor Xa bound in the prothrombinase complex.  It is a highly selective direct Factor Xa inhibitor with oral bioavailability and rapid onset of action.  Inhibition of Factor Xa interrupts the intrinsic and extrinsic pathway of the blood coagulation cascade, inhibiting both thrombin formation and development of thrombi.  Rivaroxaban does not inhibit thrombin (activated Factor II).

75.     Defendants routinely marketed Xarelto® as a "one size fits all" drug. In their fervent marketing of Xarelto, Defendants' misinformed patients and their healthcare providers as to the necessity to routinely monitor any patient requiring a blood thinning agent.  In essence, the Defendants have created a new drug, Xarelto®, that is not better than warfarin from a safety

---

[3] http://www.xarelto-us.com/dvt-pe/treatment-of-dvt-pe

[4] http://www.xarelto-us.com/dvt-pe/xarelto-difference# and http://www.xarelto-us.com/how-xarelto-is-different

[5] http://www.xarelto-us.com/knowing-your-stroke-risk

perspective, and at best, is only perhaps slightly easier to use and administer.  The idea of this apparently easier-to-use anticoagulant evidently appealed to physicians, who were subject to extreme marketing and promotion by the Defendants, but ignores patient safety.

76.     The Defendants' marketing materials suggest that Xarelto® represented a therapeutic simplification and therapeutic progress because it did not require patients to undergo periodic monitoring with blood tests and because there were no dietary restrictions.

77.     Defendants' boxed warning did not address the increased risk for serious and fatal bleeding, despite the fact that the information listed on their website originating from the Rocket AF clinical trial sponsored by Defendants, states that in comparison to warfarin, patients taking Xarelto® have more gastrointestinal bleeds and need more transfusions.  In spite of this reference regarding bleeds, the information is still wholly inadequate because, this information was not conveyed in the boxed warning on the Xarelto® label.[6]

78.     According to Institute for Safe Medication Practices, QuarterWatch Report, issued on October 3, 2012, the primary reported adverse event related to Xarelto® use "was not the well-understood risk of hemorrhage.  Instead, the largest identifiable category was serious blood-clot-related injury--most frequently pulmonary embolism--the very events rivaroxaban is intended to prevent."  This lack of efficacy for short term users of Xarelto® post hip and knee replacement surgery resulted in about 44% of the reported adverse effects from taking Xarelto®.

79.     FDA clinical reviewers have stated that "rivaroxaban should not be approved unless the manufacturer conducts further studies to support the efficacy and safety of rivaroxaban" and the FDA website notes that "[a]dverse event reports of thrombocytopenia and venous thromboembolic events were identified" in relationship to Xarelto®".[7]  However, this information

---

[6] http://www.xareltohcp.com/reducing-stroke-risk/safety.html

was not portrayed in the warning section on the warning label.  The lack of efficacy of the medication for patients taking Xarelto® post hip and knee surgery were not disclosed resulting in patients ingesting Xarelto® and physicians prescribing Xarelto® without sufficient information to make an accurate decision.

80.     Defendants fervently marketed Xarelto® using print advertisements, online marketing on their website, and video advertisements with no regard to the accuracy and repercussions of their misleading advertising in favor of increasing sales.

81.     In the January/February 2013 issue of *WebMD* magazine, Defendants placed a print advertisement that resulted in the Office of Prescription Drug Promotion (OPDP) of the U.S. Food and Drug Administration (FDA) sending a letter stating that their print advertisement was "false or misleading because it minimizes the risks associated with Xarelto® and makes a misleading claim."  Furthermore, the advertisement states "And there are no dosage adjustments" in conflict with the product labeling approved by the FDA.[8]

82.     As a result of Defendants' intense marketing, "[a]bout 130,000 U.S. prescriptions were written for Xarelto® in the first three months of 2012" resulting in large profits as Xarelto® costs approximately $3,000 a year versus $200 for generic warfarin.[9]

83.     As a result of Defendant's extreme marketing tactics, within the United Kingdom, Defendants also made 219 million Euros in sales from Xarelto®, more than three times as much as during the same period last year.[10]

---

[7] http://www.fda.gov/drugs/guidancecomplianceregulatoryinformation/surveillance/ucm204091.htm

[8] http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM357833, June 6, 2013 FDA Warning Letter

[9] http://www.huffingtonpost.com/2012/06/14/pradaxa-xarelto-blood-thinner-doctors-heart_n_1595971.html

84.     Due to the defective nature of Xarelto®, persons who were prescribed and ingested Xarelto®, for even a brief period of time, including the Decedent herein, were at increased risk for developing life-threatening bleeds.  Due to the flawed formulation of Xarelto®, which according to Defendants does not require regular blood monitoring or frequent doctor follow-up, raises concerns about the risk of stroke, bleeding, and blood clots if not taken properly or absorbed properly, particularly in patients with poor renal function.  In addition, "[p]rominent U.S. [cardiologists and health care professionals] stress that neither new drug [Xarelto] has a known antidote for a bleeding emergency, as warfarin does."[11]

85.     Defendants' Pharmaceuticals Xarelto® led to 968 suspected undesirable side-effects including 72 cases of death in Germany in just the first eight months of 2013.[12]

86.     In addition, The Institute for Safe Medication Practices reported that:

"A clinical trial with 14,000 patients had shown that rivaroxaban was no worse than warfarin. [40] But reviewers noted that warfarin had not been optimally used. If rivaroxaban were really inferior to optimally used warfarin--but this was not proven, only suspected--its use could lead to increased death and injury. [41]  Reviewers also questioned the convenient once-a-day dosing scheme, saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing.  . . . As with other anticoagulants, the rate of clinically relevant bleeding in clinical studies was high--15% per year of treatment."[13]

87.     Even more significantly, in the first quarter of 2012, The Institute for Safe

---

[10]Frank Siebelt, Hans Seidenstuecker, and Christoph Steitz.  "Reports of side-effects from Bayer's Xarelto grow:  Spiegel"
http://www.reuters.com/article/2013/09/08/us-bayer-xarelto-idUSBRE9870AH20130908

[11] http://www.huffingtonpost.com/2012/06/14/pradaxa-xarelto-blood-thinner-doctors-heart_n_1595971.html

[12] Frank Siebelt, Hans Seidenstuecker, and Christoph Steitz.  "Reports of side-effects from Bayer's Xarelto grow:  Spiegel"
http://www.reuters.com/article/2013/09/08/us-bayer-xarelto-idUSBRE9870AH20130908

[13] Institute for Safe Medication Practices, QuarterWatch Report, October 3, 2012

Medication Practices "identified 356 reports of serious, disabling, or fatal injury in which rivaroxaban was the primary suspect drug.  The report more than doubled from the previous quarter total of 128 cases."[14]  However, when the findings were discussed with Defendants, "the company told us that it had reviewed the same data and saw no signal of a safety issue that needed to be addressed."[15]  Defendants placed more value into ensuring that their profits would continue instead of working on minimizing the serious, disabling, or fatal injuries that were occurring due to the drug they were marketing and promoting.

88.     Defendants concealed their knowledge that Xarelto® can cause life threatening, irreversible bleeds from the Decedent, other consumers, the general public, and the medical community.  The Defendants did not adequately warn of the irreversible nature of Xarelto®.  Specifically, Defendants did not adequately inform consumers and the prescribing medical community about the risks of uncontrollable bleeds associated with Xarelto® usage, nor did Defendants warn or otherwise advise on how to intervene and stabilize a patient should a bleed occur.

89.     Moreover, Defendants failed to adequately warn about the lack of an antidote to reverse uncontrolled bleeding caused by Xarelto®.   Defendants merely indicated that there was a risk for bleeding and side-stepped the important issue of reversing the effects of Xarelto® should a bleed occur.  Other safer alternatives to Xarelto® have an antidote that can reverse uncontrolled bleeding.

90.     Importantly, Xarelto® still does not have a "black box" warning informing patients or prescribing doctors that Xarelto® can cause irreversible bleeds.  In fact, a label change as recent

---

[14] *Id.*
[15] *Id.*

as March 2014 still fails to contain a "black box" warning regarding irreversible bleeds.[16]

91.     Aside from the warning labels, Defendants did not issue a Dear Doctor letter that sufficiently outlined the dangers of administering Xarelto® to a patient.  In the September 2013 letter to healthcare professionals, Defendants do not mention the lack of an antidote in Xarelto® should serious and fatal bleeding occur while a patient was taking Xarelto®.

92.     The current warning is simply inadequate. The Defendants have failed and continue to fail in their duties to warn and protect the consuming public, including the Decedent.

93.     In addition to damages for the Defendants' inadequate warnings, Xarelto® also lacks any benefit sufficient to tolerate the extreme risk posed by the ingestion of this drug.

94.     Xarelto® is unreasonably dangerous and defective as formulated putting consumers, including Decedent, at an unreasonable risk of suffering needless injuries and death.

95.     Defendants willfully, wantonly and with malice withheld the knowledge of increased risk of irreversible bleeds in users of Xarelto® to prevent any chances of their product's registrations being delayed or rejected by FDA.

96.     As the manufacturers and distributors of Xarelto®, Defendants knew or should have known that Xarelto® use was associated with irreversible bleeds.

97.     With the knowledge of the true relationship between use of Xarelto® and irreversible bleeds, rather than taking steps to pull the drug off the market, provide strong warnings, or create an antidote, Defendants promoted and continue to promote Xarelto® as a safe and effective treatment for AFib.

---

[16] http://www.accessdata.fda.gov/drugsatfda_docs/label/2014/022406s009lbl.pdf

98.     According to the World Preview report, Defendants' "Xarelto® ... is estimated to be the 19th-best-selling drug in the world by 2018" and "Worldwide sales of Xarelto® are expected to jump from $596 million in 2012 to $3.7 billion in 2018."[17]

99.     While Defendants enjoy great financial success from their expected blockbuster drug, Xarelto®, they continue to place American citizens at risk of severe bleeds and death.

100.     Consumers, including Decedent, Mildred  M. Parham, who have used Xarelto® to reduce the risk of stroke due to Afib or to reduce the risk of blood clots, particularly DVT and PE, following knee or hip replacement surgery, have several alternative safer products available to treat the conditions and have not been adequately warned about the significant risks and lack of benefits associated with Xarelto® therapy.

101.     Defendants, through their affirmative misrepresentations and omissions, actively concealed from Decedent and Decedents physicians the true and significant risks associated with Xarelto® use.

102.     As a result of Defendants' actions, Decedent and Decedent's physicians were unaware, and could not have reasonably known or have learned through reasonable diligence, that Decedent would be exposed to the risks identified in this Complaint.  The increased risks and subsequent medical damages associated with Decedent's Xarelto® use were the direct and proximate result of Defendants' conduct.

## FACTUAL ALLEGATIONS

103.     On or around December 2012, Decedent was first prescribed and began taking Xarelto® upon direction of his physician.  Subsequently, as a direct result of Decedent's ingestion of Xarelto®, Decedent presented on or around May 4, 2013 to Research Medical Center

---

[17] http://www.drugwatch.com/2013/07/23/blood-thinner-growth-more-risk/

where he was admitted to ICU with intracerebral hemorrhage.  Decedent's Xarelto was

discontinued.  Decedent then was transferred to Select Specialty Care on or around May 18, 2013.

104.    Then, on or around May 22, 2013, Decedent was transferred from Select Hospital to

Research Medical Center where Decedent subsequently died from complications resulting from his

use of Xarelto.

105.    As a direct result of being prescribed Xarelto® for this period of time, Decedent

suffered significant injuries and death, such as those described above.

106.    As a proximate result of Defendants' acts and omissions, Decedent suffered the

injuries and death described hereinabove due to Decedent's ingestion of Xarelto®.  Plaintiff

accordingly seeks damages associated with these injuries and death.

107.    Decedent would not have used Xarelto® had Defendants properly disclosed

the risks associated with its use, as safer alternatives without the aforesaid risks were available.

## FEDERAL REQUIREMENTS

108.    Defendants had an obligation to comply with the law in the manufacture, design,

and sale of Xarelto®.

109.    Upon information and belief, Defendants violated the Federal Food, Drug and

Cosmetic Act, 21 U.S.C. §301, *et seq*.

110.    With respect to the prescription drug Xarelto®, the Defendants, upon information

and belief, has or may have failed to comply with all federal standards applicable to the sale of

prescription drugs including, but not limited to, one or more of the following violations:

> a.   The prescription drug Xarelto® is adulterated pursuant to 21 U.S.C. § 351
> because, among other things, it fails to meet established performance
> standards, and/or the methods, facilities, or controls used for its manufacture,
> packing, storage or installation is not in conformity with federal
> requirements. See, 21 U.S.C. § 351.

21

b.   The prescription drug Xarelto® is adulterated pursuant to 21 U.S.C. § 351 because, among other things, its strength differs from or its quality or purity falls below the standard set forth in the official compendium for XARELTO® and such deviations are not plainly stated on their labels.

c.   The prescription drug Xarelto® is misbranded pursuant to 21 U.S.C. §352 because, among other things, it's labeling is false or misleading.

d.   The prescription drug Xarelto® is misbranded pursuant to 21 U.S.C. §352 because words, statements, or other information required by or under authority of chapter 21 U.S.C. § 352 are not prominently placed thereon with such conspicuousness and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

e.   The prescription drug Xarelto® is misbranded pursuant to 21 U.S.C. §352 because the labeling does not bear adequate directions for use, and/or the labeling does not bear adequate warnings against use where its use may be dangerous to health or against unsafe dosage or methods or duration of administration or application, in such manner and form as are necessary for the protection of users.

f.   The prescription drug Xarelto® is misbranded pursuant to 21 U.S.C. §352 because it's dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof.

g.   The prescription drug Xarelto® does not contain adequate directions for use pursuant to 21 CFR § 201.5, because, among other reasons, of omission, in whole or in part, or incorrect specification of (a) statements of all conditions, purposes, or uses for which it is intended, including conditions, purposes, or uses for which it is prescribed, recommended or suggested in their oral, written, printed, or graphic advertising, and conditions, purposes, or uses for which the drugs are commonly used, (b) quantity of dose, including usual quantities for each of the uses for which it is intended and usual quantities for persons of different ages and different physical conditions, (c) frequency of administration or application, (d) duration or administration or application, and/or (d) route or method of administration or application.

h.   The Defendants violated 21 CFR § 201.56 because the labeling was not informative and accurate.

i.   The prescription drug Xarelto® is misbranded pursuant to 21 CFR § 201.56 because the labeling was not updated as new information became available

22

that caused the labeling to become inaccurate, false, or misleading.

j.  The Defendants violated 21 CFR § 201.57 by failing to provide information that is important to the safe and effective use of the drug including the potential of Xarelto® causing and the need for regular and/or consistent monitoring to ensure that a potential fatal bleed has not developed.

k.  The Defendants violated 21 CFR § 201.57 because they failed to identify specific tests needed for selection or monitoring of patients who took the prescription drug Xarelto®.

l.  The prescription drug Xarelto® is mislabeled pursuant to 21 CFR § 201.57 because the labeling fails to describe serious adverse reactions and potential safety hazards, limitations in use imposed by it, and steps that should be taken if they occur.

m.  The prescription drug Xarelto® is mislabeled pursuant to 21 CFR § 201.57 because the labeling was not revised to include a warning as soon as there was reasonable evidence of an association of a serious hazard with the drug.

n.  The Defendants violated 21 CFR § 201.57 because the labeling failed to list the adverse reactions that occur with the prescription drug Xarelto® and other drugs in the same pharmacologically active and chemically related class.

o.  The Defendants violated 21 CFR § 201.57 because the Defendants failed to list that a patient could develop irreversible bleeding before the other adverse reactions on the labeling of the prescription drug Xarelto®.

p.  The prescription drug Xarelto® violates 21 CFR § 210.1 because the process by which it was manufactured, processed, and/or held fails to meet the minimum current good manufacturing practice of methods to be used in, and the facilities and controls to be used for, the manufacture, packing, or holding of a drug to assure that it meets the requirements as to safety and have the identity and strength and meets the quality and purity characteristic that they purport or are represented to possess.

q.  The prescription drug Xarelto® violates 21 CFR § 210.122 because the labeling and packaging materials do not meet the appropriate specifications.

r.  The prescription drug Xarelto® violates 21 CFR § 211.165 because the test methods employed by the Defendants are not accurate, sensitive, specific, and/or reproducible and/or such accuracy, sensitivity, specificity, and/or reproducibility of test methods have not been properly established and documented.

s.   The prescription drug Xarelto® violates 21 CFR § 211.165 in that the prescription drug XARELTO® fails to meet established standards or specifications and any other relevant quality control criteria.

t.   The prescription drug Xarelto® violates 21 CFR § 310.303 in that the prescription drug Xarelto® is not safe and effective for its intended use.

u.   The Defendants violated 21 CFR § 310.303 because the Defendants failed to establish and maintain records and make reports related to clinical experience or other data or information necessary to make or facilitate a determination of whether there are or may be grounds for suspending or withdrawing approval of the application to the FDA.

v.   The Defendants violated 21 CFR §§310.305 and 314.80 by failing to report adverse events associated with the prescription drug Xarelto® as soon as possible or at least within 15 days of the initial receipt by the Defendants of the adverse drugs experience.

w.   The Defendants violated 21 CFR §§310.305 and 314.80 by failing to conduct an investigation of each adverse event associated with the prescription drug Xarelto®, and evaluating the cause of the adverse event.

111.   Defendants failed to meet the standard of care set by the above statutes and regulations, which were intended for the benefit of individual consumers such as the Plaintiff, making the Defendants liable.

## EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATION

112.   Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

113.   The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment.  Defendants, through failing to disclose, for three years, the truth about the safety and efficacy of Xarelto®, to Decedent's physicians and/or Decedent, and misrepresenting Xarelto® as safe and efficacious for its intended use, actively concealed from said individuals the true risks associated with the use of Xarelto® drug products.

114.     Decedent had no knowledge that Defendants were engaged in the wrongdoing alleged herein.  Because of the fraudulent acts of concealment of wrongdoing by the Defendants, the Decedent could not have reasonably discovered the wrongdoing at any time prior to the commencement of this action.

115.     Decedent, nor Decedent's physicians, could have possibly determined the nature, extent and identity of related health risks associated with Xarelto®. Decedent and Decedent's physicians reasonably relied on Defendants to disseminate truthful and accurate safety and efficacy information about its drug and warn of the side effects complained of herein.

116.     Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the defective nature of Xarelto®.  Defendants were under a duty to disclose the true character, quality, and nature of Xarelto® because this was nonpublic information over which the Defendants have, and continue to have, exclusive control, and because Defendants knew this information was not available to the Decedent or his physicians.  In addition, the Defendants are estopped from relying on any statute of limitations because of their concealment of these facts.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT I
## STRICT PRODUCTS LIABILITY- FAILURE TO WARN

117.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

118.     Plaintiff, Dixie A. Smith, individually and as successor in interest of Jay Christopher Smith, brings Count I of this complaint for the wrongful death of Jay Christopher Smith

119.     Plaintiff has standing to prosecute this action pursuant to LSA-C.C. Art. 2315.2.

120.     Defendants owed a duty of reasonable care to adequately warn of the risks associated with the use of Xarelto® to Decedent and the general public.

121.     Defendants knew or reasonably should have known that the warnings provided to users of Xarelto® regarding the risks associated with its use were incorrect and misleading in at least the following material respects:

    a.  Xarelto® was unaccompanied by proper warnings regarding all possible side effects associated with its use and the comparative severity, incidence, and duration of such adverse effects; and

    b.  Xarelto® was defective due to inadequate post-marketing warnings or instructions, because Defendants failed to provide adequate warnings to users or consumers and continued aggressively to promote Xarelto®, even after it knew or should have known of the risks of injury from this drug; and

    c.  Xarelto® was unaccompanied by proper warnings regarding irreversible bleeding caused by Xarelto® and Defendants continued to aggressively promote Xarelto®, even after it knew of should have known of the risk of irreversible bleeding from this drug; and

    d.  Defendants failed to warn that there were other drugs available that did not have the same risks as Xarelto®.

122.     By failing to warn Decedent and Decedent's physicians of the adverse health risks

associated with Xarelto®, Defendants breached their duty to Decedent of reasonable care and safety.

123.    Defendants, as manufacturers and distributers of PHARMACEUTICALS drugs, are held to the level of knowledge of an expert in the field; and further, Defendants knew or should have known that warnings and other clinically relevant information and data which they distributed regarding the risks of irreversible bleeds and other injuries and death associated with the use of Xarelto® were inadequate.

124.    Decedent did not have the same knowledge as Defendants and no adequate warning or other clinically relevant information and data was communicated to Decedent or to Decedent's treating physicians.

125.    Defendants had a continuing duty to provide consumers, including Decedent and Decedent's physicians, with warnings and other clinically relevant information and data regarding the risks and dangers associated with Xarelto®, as it became or could have become available to Defendants.

126.    Defendants marketed, promoted, distributed and sold an unreasonably dangerous and defective prescription drug, Xarelto®, to health care providers empowered to prescribe and dispense Xarelto® to consumers, including Decedent, without adequate warnings and other clinically relevant information and data.  Through both omission and affirmative misstatements, Defendants misled the medical community about the risk and benefit balance of Xarelto®, which resulted in injury and death to Decedent.

127.    Despite the fact that Defendants knew or should have known that Xarelto® caused unreasonable and dangerous side effects, they continued to promote and market Xarelto® without stating that there existed safer and more or equally effective alternative drug products and/or

providing adequate clinically relevant information and data.

128. Defendants knew or should have known that consumers, including Decedent specifically, would foreseeably and needlessly suffer injury or death as a result of Defendants' failures.

129. Defendants failed to provide timely and adequate warnings to physicians, pharmacies, and consumers, including Decedent, and to Decedent's intermediary physicians, in the following ways:

a. Defendants failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert Decedent and Decedent's physicians to the dangerous risks of Xarelto® including, among other things, irreversible bleeds;

b. Defendants failed to provide adequate post-marketing warnings and instructions after the Defendants knew or should have known of the significant risks of, among other things, irreversible bleeds;

c. Defendants continued to aggressively promote and sell Xarelto®, even after they knew or should have known of the unreasonable risks of irreversible bleeds from this drug.

130. Defendants had an obligation to provide Decedent and Decedent's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to Xarelto®, and/or that there existed safer and more or equally effective alternative drug products.

131. By failing to provide Decedent and Decedent's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with

28

exposure to Xarelto®, and/or that there existed safer and more or equally effective alternative drug products, Defendants breached their duty of reasonable care and safety.

132.    Defendants' actions described above were performed willfully, intentionally, and with reckless disregard of the life and safety of the Decedent and the general public.

133.    Defendants' failure to exercise reasonable care in the design, dosing information, marketing, warnings, and/or manufacturing of Xarelto® was a proximate cause of Decedent's injuries and damages.

134.    Plaintiff seeks all damages to which they may be justly entitled.

135.    As a direct and proximate result of the actions and inactions of the Defendants as set forth above, Decedent was exposed to Xarelto® and suffered the injuries and damages set forth hereinabove.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT II
## STRICT PRODUCTS LIABILITY – DESIGN DEFECT

136.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

137.    Plaintiff, Dixie A. Smith, individually and as successor in interest of Jay Christopher Smith, brings Count II of this complaint for the wrongful death of Jay Christopher Smith

138.    At all times material to this lawsuit, Defendants were engaged in the business of designing, manufacturing, testing, marketing, distributing and selling Xarelto® for the sale to, and use by, members of the public. The Xarelto® manufactured by Defendants reached Decedent

without substantial change and was ingested as directed.  The Xarelto® was defective and unreasonably dangerous when it entered into the stream of commerce and when used by Decedent.

139.    Defendants sold the Xarelto® which was ingested by Decedent.

140.    Defendants owed a duty to the general public, and specifically to the Decedent, to exercise reasonable care in the design, study, development, manufacture, promotion; sale, marketing and distribution of their prescription medications, including the Xarelto® at issue in this lawsuit.  Defendants failed to exercise reasonable care in the design of Xarelto® because as designed, Xarelto was capable of causing serious personal injuries such as those suffered by Decedent during foreseeable use.  Defendants also failed to exercise reasonable care in the marketing of Xarelto® because they failed to warn, that as designed, Xarelto® was capable of causing serious personal injuries such as those suffered by Decedent during foreseeable use.

141.    Xarelto® was defective due to inadequate post-marketing warnings and instruction because Defendants knew or should have known of the risk and danger of serious bodily harm and or death from the use of Xarelto®, but failed to provide an adequate warning to patients and prescribing physicians of the product, knowing the product could cause serious injury and or death.

142.    The Xarelto® ingested by Decedent was defective and, because of its defects, was unreasonably dangerous to persons who might reasonably be expected to require its use.  In addition, this drug was dangerous to the extent beyond that which could reasonably be contemplated by Decedent.  Any benefit of Xarelto® was far outweighed by the serious and undisclosed risks of its use, and other drugs performed the same function without the increased risks of Xarelto®.

143.    The Xarelto® ingested by Decedent was defective at the time it was distributed by the Defendants or left their control.

30

144.    Decedent was a person who would reasonably be expected to use Xarelto®.

145.    Defendants' failure to exercise reasonable care in the design, dosing information, marketing, warnings, and/or manufacturing of Xarelto® was a proximate cause of Decedent's injuries and damages.

146.    Plaintiff seeks all damages to which they may be justly entitled.

147.    As a direct and proximate result of the actions and inactions of the Defendants as set forth above, Decedent was exposed to Xarelto® and suffered the injuries and damages set forth hereinabove.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT III
## NEGLIGENCE

148.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

149.    Plaintiff, Dixie A. Smith, individually and as successor in interest of Jay Christopher Smith, brings Count III of this complaint for injuries to and the wrongful death of Jay Christopher Smith.

150.    At all times relevant and material hereto, Defendants owed a duty to Decedent of reasonable care and safety.

151.    Defendants owed a duty to the general public, and specifically to the Decedent, to not introduce a drug into the market, or continue a previous tender of a drug, including the Xarelto® at issue in this lawsuit, that was unreasonably dangerous for any person to use it

31

and was capable of causing serious personal injuries such as those suffered by Decedent during foreseeable use.

152.    Defendants' duties included, but were not limited to, carefully and properly designing, testing, manufacturing, licensing, packaging, promoting, advertising, selling, and/or distributing Xarelto® into the stream of commerce, and providing warnings with regard to this drug.

153.    Defendants breached their duty of care and were negligent by, but not limited to, the following actions, misrepresentations, and omissions toward Decedent:

a.    Failing to exercise reasonable and ordinary care in that the drug Xarelto® was so unreasonably dangerous and defective in design that it never should have been on the market or taken by anyone;

b.    Failing to exercise reasonable and ordinary care in the design, research, development, manufacture, sale, testing and or distribution of the drug Xarelto®.

c.    Tendering into the market a drug which Defendants knew or should have known was so dangerous that it shouldn't have been taken by anyone.

d.    Violating its duty of care in design by tendering into the market a drug which it knew or should have known should not have been taken by anyone.

e.    Violating its duty of care in design in marketing by tendering into the market a drug which it knew or should have known should not have been taken by anyone.

f.    Violating its duty of care in design by placing an unsuitable product into the market for public consumption.

g.    Failing to use ordinary care in designing, testing, and manufacturing

Xarelto® so as to avoid the high risk to users of unreasonable, dangerous side-effects, some of which are fatal;

h.    Failing to accompany Xarelto® with adequate warnings that would alert doctors, consumers, and other users to the potential adverse side effects associated with the use of this drug and the nature, severity and duration of such adverse effects;

i.    Failing to conduct adequate pre-clinical testing and post-marketing surveillance to determine the safety and side effects of Xarelto®;

j.    Defendants were otherwise careless or negligent.

154.    The Xarelto® that injured Decedent was in substantially the same condition when Decedent ingested it as it was in when it left the control of Defendants. Xarelto®'s ability to cause serious personal injuries and damages such as those suffered by Decedent was not due to any voluntary action or contributory negligence of Decedent. Decedent consumed the Xarelto® as directed and without change in its form or substance.

155.    Although Defendants knew or should have known that Xarelto® caused unreasonably dangerous side effects which many users would be unable to remedy by any means, Defendants continued to market this drug to doctors when there were safer and less expensive alternatives available.

156.    In addition, Defendants had a legal duty to comply with the U.S. Food, Drug and Cosmetic Act, U.S. Code § 21 USC §301, et seq., and. regulations promulgated there under.

157.    Defendants negligently and carelessly violated the laws and regulations of the United States including, but not limited to the following: 21 CFR §330.10(a)(4)(v) (Labeling); 21 CFR § 369.10 (Labeling); 21 CFR §§ 201.56 and 201.57 (d), (e) and (f) (Labeling); 21 CFR 1.21 (a) (Labeling); 21 CFR 600.80 (Post-marketing Reporting of Adverse Experiences); 21 CFR §314. 50

(Post Marketing Reports of Adverse Drug Experiences), as well as regulations relating to the promotion of drugs for unlabeled uses. The violations of those and other statutes and regulations constitute negligence per se.

158.    Defendants owed a duty to the general public, and specifically to the Plaintiff Decedent, to exercise reasonable care in the design, study, development, manufacture, promotion; sale, marketing and distribution of their prescription medications, including the Xarelto® at issue in this lawsuit.  Defendants failed to exercise reasonable care in the design of Xarelto® because as designed, Xarelto was capable of causing serious personal injuries such as those suffered by Decedent during foreseeable use.  Defendants also failed to exercise reasonable care in the marketing of Xarelto® because they failed to warn, that as designed, Xarelto® was capable of causing serious personal injuries such as those suffered by Decedent during foreseeable use.

159.    Defendants breached their duty and were negligent in, but not limited to, the following actions, misrepresentations, and omissions toward Decedent:

a.    Failing to use due care in developing, testing, designing, and manufacturing Xarelto® so as to avoid the aforementioned risks to individuals when Xarelto® was being used for treatment;

b.    Failing to accompany their product with proper or adequate warnings, or labeling regarding adverse side effects and health risks associated with the use of Xarelto® and the comparative severity and duration of such adverse effects;

c.    In disseminating information to Decedent and Decedent's physicians that was negligently and materially inaccurate, misleading, false, and unreasonably dangerous to patients such as Decedent;

d.    Failing to accompany their products with proper or adequate rate of incidence or prevalence of irreversible bleeds;

e.    Failing to provide warnings or other information that accurately reflected the symptoms, scope, and severity of the side effects and health risks;

f.    Failing to conduct adequate pre-clinical and clinical testing and post- marketing surveillance to determine the safety of Xarelto®;

g.    Failing to warn Decedent, the medical and healthcare community, and consumers that the product's risk of harm was unreasonable and that there were safer and effective alternative medications available to Decedent and other consumers;

h.    Failing to provide adequate training or information to medical care providers for appropriate use and handling of Xarelto® and patients taking Xarelto®;

i.    Failing to adequately test and/or warn about the use of Xarelto®, including, without limitations, the possible adverse side effects and health risks caused by the use of Xarelto®;

j.    Failing to design and/or manufacture a product that could be used safely due to the lack of a known reversal agent or antidote;

k.    In designing, manufacturing, and placing into the stream of commerce a product which was unreasonably dangerous for its reasonably foreseeable use, which Defendant knew or should have known could cause injury to Plaintiff Decedent;

l.    Failing to remove Xarelto® from the market when Defendants' knew or should have known of the likelihood of serious side effects and injury to its users;

35

m.   Failing to adequately warn users, consumers and physicians about the severity, scope and likelihood of bleeds and related dangerous conditions to individuals taking Xarelto®; and

n.   Representing to physicians, including but not limited to Decedent's prescribing physicians, that this drug was safe and effective for use.

160.   The Xarelto® that injured Decedent was in substantially the same condition when Decedent ingested it as it was in when it left the control of Defendants.  Defendants' Xarelto®'s ability to cause serious personal injuries and damages, such as those suffered by Decedent, was not due to any voluntary action or contributory negligence of Decedent.  Decedent consumed the Xarelto® as directed and without change in its form or substance.

161.   Defendants' failure to exercise reasonable care in the design, dosing information, marketing, warnings, and/or manufacturing of Xarelto® was a proximate cause of Decedent's injuries and damages.

162.   Plaintiff seeks all damages to which they may be justly entitled.

163.   The Plaintiff's and Decedent's injuries and damages are severe and permanent, and will continue into the future. As a result, the Plaintiff seeks actual and punitive damages from the Defendants.

164.   As a direct and proximate result of the actions and inactions of the Defendants as set forth above, Decedent was exposed to Xarelto® and suffered the injuries and damages set forth hereinabove.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT IV
## NEGLIGENCE- FAILURE TO WARN

165.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if

fully set forth herein and further alleges as follows:

166.     Plaintiff, Dixie A. Smith, individually and as successor in interest of Jay Christopher

Smith, brings Count IV of this complaint for the injuries to and wrongful death of Jay Christopher

Smith.

167.     Defendants owed a duty to warn of any dangerous defects or side effects; a duty to

assure their product did not cause users unreasonable and dangerous risks, reactions, and side

effects; and a duty to provide adequate post market surveillance and warnings as it learned of

Xarelto®'s substantial dangers.

168.     Xarelto® was defective due to inadequate post-marketing warnings and instruction

because Defendants knew or should have known of the risk and danger of serious bodily harm and

or death from the use of Xarelto®, but failed to provide an adequate warning to patients and

prescribing physicians of the product, knowing the product could cause serious injury and or death.

169.     Decedent was prescribed and used Xarelto® for its intended purpose.

170.     Decedent could not have known about the dangers and hazards presented

by Xarelto®.

171.     The warnings that were given by the Defendants were not accurate, clear, complete,

and/or were ambiguous.

172.     The warnings, or lack thereof, that were given by the Defendants failed to properly

warn prescribing physicians of the risk of irreversible bleeding and other serious injuries and side

effects, and failed to instruct prescribing physicians to test and monitor for the presence of the

injuries for which Plaintiff and others had been placed at risk.

173.    The warnings that were given by the Defendants failed to properly warn Decedent and prescribing physicians of the prevalence of irreversible bleeds.

174.    The Decedent, individually and through hisprescribing physicians, reasonably relied upon the skill, superior knowledge, and judgment of the Defendants.  The Defendants had a continuing duty to warn the Decedent and prescribing physicians of the dangers associated with Xarelto®.  Had Decedent received adequate warnings regarding the risks of Xarelto®, she would not have used Xarelto®.

175.    Defendants breached their duty of reasonable care to Decedent in the following material respects:

a.    Xarelto® was unaccompanied by proper warnings regarding all possible side effects associated with its use and the comparative severity, incidence, and duration of such adverse effects; and

b.    Xarelto® was defective due to inadequate post-marketing warnings or instructions, because Defendants failed to provide adequate warnings to users or consumers and continued aggressively to promote Xarelto®, even after Defendants knew or should have known of the risks of injury from this drug; and

c.    Xarelto® was unaccompanied by proper warnings regarding irreversible bleeding caused by Xarelto® and Defendants continued to aggressively promote Xarelto®, even after Defendants knew or should have known of the risk of irreversible bleeding from this drug; and

d.    Defendants failed to warn that there were other drugs available that did not have the same risks as Xarelto®.

38

176.    Defendants knew or should have known that Xarelto® caused unreasonably dangerous risks and side effects of which the general public would not be aware.  Defendants nevertheless advertised, marketed, and promoted their product knowing there were safer products on the market.

177.    Defendants knew that Xarelto® was defective and unreasonably dangerous when it left the possession of the Defendants in that it contained warnings insufficient to alert patients and prescribing physicians of the dangerous risks and reactions associated with Xarelto®, including but not limited to the prevalence of irreversible bleeding, and other serious injuries and side effects despite the Defendant's knowledge of the increased risk of these injuries over other anticoagulation therapies available.

178.    Defendants' failure to exercise reasonable care in the design, dosing information, marketing, warnings, and/or manufacturing of Xarelto® was a proximate cause of Decedent's injuries and damages.

179.    Plaintiff seeks all damages to which they may be justly entitled.

180.    As a direct and proximate result of the actions and inactions of the Defendants as set forth above, Decedent was exposed to Xarelto® and suffered the injuries and damages set forth hereinabove.

181.    For the above reasons, the Defendants are strictly liable under Louisiana product liability law without regard to proof of negligence or gross negligence.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT V

## MANUFACTURING DEFECT / NEGLIGENT DESIGN

Comes now Plaintiff and for Count V of this Complaint alleges:

182.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

183.    Plaintiff, Dixie A. Smith, individually and as successor in interest of Jay Christopher Smith, brings Count V of this complaint for the injuries to and wrongful death of Jay Christopher Smith.

184.    At all times material to this action, Defendants were engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling and injecting into the stream of commerce, in the regular course of its business, the PHARMACEUTICALS drug Xarelto®, which Defendants knew would be used by Decedent and others.

185.    At the time Xarelto® was manufactured and sold to Decedent by Defendants, it was defective in design and unreasonably dangerous, subjecting users to risks of blood clots and irreversible bleeding which exceeded the benefits of the products, and for which other safer products were available.

186.    Alternatively, when Xarelto® was manufactured and sold to Decedent by Defendants, the product was defective in design and formulation, making use of the product more dangerous than other drugs for its intended use.

187.    The Xarelto® sold to Decedent reached hiswithout substantial change. Decedent was unaware of the dangerousness of the product until after its use.  Decedent ingested the Xarelto® without making any changes or alterations.

188.    In designing and testing Xarelto®, the Defendants failed to exercise the ordinary

40

care that a careful and prudent drug manufacturer would exercise in the same or similar

circumstances.

189.    At all times material to this action, Actos was designed, developed, manufactured,

tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendants in a

defective and unreasonably dangerous condition at the time it was placed in the stream of

commerce in ways which include, but are not limited to, one or more of the following

particulars:

a.    When placed in the stream of commerce, Xarelto® contained unreasonably
dangerous design defects and was not reasonably safe as intended to be used,
subjecting Plaintiff to risks that exceeded the benefits of the subject product,
including but not limited to permanent personal injuries including, but not
limited to, developing irreversible bleeds and other serious injuries and side
effects, including death;

b.    When placed in the stream of commerce, Xarelto® was defective in design and
formulation, making the use of Xarelto® more dangerous than an ordinary
consumer would expect, and more dangerous than other risks associated with
the other medications and similar drugs on the market;

c.    Xarelto®'s design defects existed before it left the control of the Defendants;

d.    Xarelto® was insufficiently tested;

e.    Xarelto® caused harmful side effects that outweighed any potential utility; and

f.    Xarelto® was not accompanied by adequate instructions and/or warnings to fully
apprise consumers, including Decedent herein, of the full nature and extent of
the risks and side effects associated with its use, thereby rendering Defendants
liable to Plaintiff.

190.    In addition, at the time the subject product left the control of the Defendants, there

were practical and feasible alternative designs that would have prevented and/or significantly

reduced the risk of Decedent's injuries without impairing the reasonably anticipated or intended

function of the product. These safer alternative designs were economically and technologically

feasible, and would have prevented or significantly reduced the risk of Decedent's injuries without substantially impairing the product's utility.

191.    The subject product manufactured and/or supplied by Defendant was defective in construction or composition in that, when it left the hands of Defendants, it deviated in a material way from Defendants' manufacturing performance standards and/or it differed from otherwise identical products manufactured to the same design formula.  In particular, the product is not safe, has numerous and serious side effects and causes severe and permanent injuries including, but not limited to, developing irreversible bleeds. The product was unreasonably dangerous in construction or composition.

192.    As a direct and proximate result of the negligent design of Xarelto®, Plaintiff and Decedent have been damaged.

193.    Defendants' conduct was done with conscious disregard for the safety of users of Xarelto®, including Decedent, justifying an award of punitive damages.

194.    Plaintiff seeks all damages to which they may be justly entitled.

195.    As a direct and proximate result of the actions and inactions of the Defendants as set forth above, Decedent was exposed to Xarelto® and suffered the injuries and damages set forth hereinabove.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT VI
## NEGLIGENT MISREPRESENTATION

196.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if

fully set forth herein and further alleges as follows:

197.   Plaintiff, Dixie A. Smith, individually and as successor in interest of Jay Christopher

Smith, brings Count VI of this complaint for injuries and wrongful death of Jay Christopher Smith

198.   Defendants knew, or should have known, that there were dangerous side effects

resulting from the use of Xarelto®.

199.   Defendants knew or reasonably should have known that consumers such as

Decedent would not have known about the increased risk of irreversible bleeds, among other things,

associated with Xarelto®.

200.   Defendants, armed with the knowledge stated in the preceding paragraphs,

proceeded with the design, production, manufacture, promotion, advertising, and sale of Xarelto®

without adequate warning of the side effects and dangerous risks to the consuming public, including

Decedent.

201.   Defendants negligently represented to Decedent the safety and effectiveness

of Xarelto® and concealed material information, including adverse information regarding the safety

and effectiveness of Xarelto®. The misrepresentations and/or material omissions made by or

perpetuated by Defendants are as follows:

    a.   Defendants failed to conduct sufficient testing which, if properly performed,

       would have shown that Xarelto® had serious side effects, and warn users of those

       risks; and/or

    b.   Include adequate warnings with Xarelto® that would alert users to

       the potential risks and serious side effects of Xarelto®, as well as the limited benefits

       and the approved uses; and/or

    c.   Warn Decedent that use of Xarelto® carried a risk of death or permanent

injury from irreversible bleeding, and other serious side effects; and/or

    d.    Advise the FDA, the health care industry, and the public about the adverse

        reports it had received regarding Xarelto®.

202.    Defendants made the misrepresentations and omissions with the intent that

Decedent and the consuming public rely upon such information or the absence of such information

in selection of Xarelto®.

203.    Decedent justifiably relied on and/or was induced by the misrepresentations

and/or active concealment by Defendants and relied upon the absence of safety information, which

Defendants suppressed, concealed, or failed to disclose, all to his detriment.

204.    As a direct and proximate result of the dangerous and defective condition of

Xarelto®, Decedent was injured, and incurred economic damages in the form of medical and

funeral expenses.

205.    Plaintiff is entitled to recover from Defendants for all damages caused by the

defective product including, but not limited to, damages for pain, suffering, loss of the capacity to

enjoy life, lost past and future income and occurred expense, and death.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory

and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other

relief as the Court deems proper.

## COUNT VII
## BREACH OF WARRANTY- BREACH OF EXPRESS WARRANTY

206.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if

fully set forth herein and further alleges as follows:

207.    Plaintiff, Dixie A. Smith, individually and as successor in interest of Jay Christopher Smith, brings Count VII of this complaint for the injuries and wrongful death of Jay Christopher Smith.

208.    Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and/or otherwise released into the stream of commerce Xarelto®, in the course of same, directly advertised or marketed the product to the FDA, healthcare professionals and consumers, including Decedent, or persons responsible for consumer.

209.    Xarelto® materially failed to conform to those representations made by Defendants in package inserts, and otherwise, concerning the properties and effects of Xarelto®, respectively manufactured and/or distributed and sold by Defendants, and which Decedent purchased and ingested in direct or indirect reliance upon these express representations.  Such failures by Defendants constituted a material breach of express warranties made, directly or indirectly, to Decedent concerning Xarelto® sold to Decedent.

210.    Defendants breached these express warranties in that Xarelto® was unsafe in light of the risk of life-threatening side effects associated with its use, including irreversible bleeds

211.    Decedent relied to hisdetriment on Defendants' express warranties.

212.    As a direct, foreseeable, and proximate result of Defendants' breaches of express warranties, Decedent suffered grievous bodily injury and consequent economic and other loss, as described above, when Decedent's physician, in reasonable reliance upon such express warranties, prescribed for Decedent the use of Xarelto®.  Decedent purchased and ingested Xarelto® as prescribed and instructed by Decedent's physician, leading to Decedent's injuries.

213.    As a direct and proximate result of Defendants' breach of express warranties, Decedent was exposed to Xarelto®, and Plaintiff and Decedent suffered and continue to suffer from the injuries and damages as set forth in this Complaint.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT VIII
## BREACH OF WARRANTY- BREACH OF IMPLIED WARRANTY

214.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

215.    Plaintiff, Dixie A. Smith, individually and as successor in interest of Jay Christopher Smith, brings Count VIII of this complaint for the injuries and wrongful death of Jay Christopher Smith.

216.    Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and/or otherwise released into the stream of commerce Xarelto®, in the course of same, directly advertised or marketed the product to the FDA, healthcare professionals and consumers, including Decedent, or persons responsible for consumer.

217.    Defendants impliedly warranted their Xarelto®, which they manufactured and/or distributed and sold, and which Decedent purchased and ingested, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the product was sold.

218.    Defendants breached their implied warranties of Xarelto® sold to Decedent because this product was not fit for its common, ordinary, and intended use.

219.    As a direct, foreseeable and proximate result of Defendants' breaches of implied warranties, Decedent suffered grievous bodily injury and consequential economic and other losses, as described above, when Decedent ingested Xarelto®, in reasonable reliance upon the implied warranties, leading to Decedent's injuries.

220.    The Decedent's injuries and damages are severe and permanent, and will continue into the future. As a result, the Plaintiff seeks actual and punitive damages from the Defendants.

221.    As a direct and proximate result of the actions and inactions of the Defendants as set forth above, Decedent was exposed to Xarelto® and suffered the injuries and damages set forth hereinabove.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT IX
## FRAUD

222.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

223.    Plaintiff, Dixie A. Smith, individually and as successor in interest of Jay Christopher Smith, brings Count IX of this complaint for the injuries and wrongful death of Jay Christopher Smith.

224.    Defendants, having undertaken the manufacturing, marketing, dispensing, distribution and promotion of Xarelto® described herein, owed a duty to provide accurate and complete information regarding these products.

225.    The Defendants knew or should have known, that Xarelto® was unreasonably

dangerous and defective, and caused serious, at times fatal, irreversible bleeds.

226.    Despite their knowledge, the Defendants omitted material facts in the disclosures they made to the public, the medical community and to consumers, including the Decedent and prescribing physicians, concerning the use and safety of Xarelto®.

227.    The Defendants made untrue, deceptive, and/or misleading representations of material facts, and omitted and/or concealed material facts from the public, including the Decedent and prescribing physicians, concerning the use and safety of Xarelto®.

228.    The Defendants' practices relating to their promotion of Xarelto® created and/or reinforced a false impression as to its safety.

229.    The Defendants' practice of promoting Xarelto® placed and continues to place all consumers of Xarelto® at risk for serious injury resulting from its potentially lethal side effects.

230.    The Defendants' statements and omissions were made with the intent that the Decedent and his prescribing physician, would rely on them.

231.    The Decedent purchased and used Xarelto® for personal, family or household purposes and suffered ascertainable losses of money as a result of the Defendants' use or employment of the methods, acts, or practices.

232.    As a direct and proximate result of the Defendants' acts of fraud, the Decedent suffered irreparable injuries.

233.    Decedent endured substantial pain and suffering. As a result, the Decedent and Plaintiff incurred significant expenses for medical care and will continue to be economically and emotionally harmed in the future.

234.    As a direct and proximate result of the actions and inactions of the Defendants as set

forth above, Decedent was exposed to Xarelto® and suffered the injuries and damages set forth

hereinabove.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory

and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other

relief as the Court deems proper.

**COUNT X:**
**VIOLATION OF CONSUMER PROTECTION LAWS**

235.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if

fully set forth herein and further alleges as follows:

236.    Plaintiff, Dixie A. Smith, individually and as successor in interest of Jay Christopher

Smith, brings Count X of this complaint for the injuries and wrongful death of Jay Christopher

Smith.

237.    Decedent purchased and used Xarelto® for personal use and thereby suffered

ascertainable losses as a result of Defendants' actions in violation of the consumer protection laws.

238.    Unfair methods of competition or deceptive acts or practices that were proscribed by

law, including the following:

     a.    Representing that goods or services have characteristics, ingredients, uses

        benefits or quantities that they do not have;

     b.    Advertising goods or services with the intent not to sell them as advertised;

        and

     c.    Engaging in fraudulent or deceptive conduct that creates a likelihood of

        confusion or misunderstanding.

239.    Decedent was injured by the cumulative and indivisible nature of Defendants'

49

conduct. The cumulative effect of Defendants' conduct directed at patients, physicians and consumers was to create demand for and sell the Products. Each aspect of Defendants' conduct combined to artificially create sales of the Products

240.   Defendants violated consumer protection laws through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of Xarelto®.

241.   Defendants uniformly communicated the purported benefits of Xarelto® while failing to disclose the serious and dangerous side-effects related to the use of Xarelto® and of the true state of Xarelto® regulatory status, its safety, its efficacy, and its usefulness. Defendants made these representations to physicians, the medical community at large, and to patients and consumers such as Decedent in the marketing and advertising campaign described herein.

242.   Defendants' conduct in connection with Xarelto® was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because Defendants misleadingly, falsely and or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, costs, safety, efficacy and advantages of Xarelto®.

243.   Defendants have a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of the Product.

244.   Had Defendants not engaged in the deceptive conduct described above, Plaintiffs would not have purchased and/or paid for the Products, and would not have incurred related medical costs.

245.   Defendants' deceptive, unconscionable, or fraudulent representations and material omissions to patients, physicians and consumers, including Plaintiffs, constituted unfair and deceptive acts and trade practices in violation of the state consumer protection statutes listed.

246.   Defendants' actions, as complained of herein, constitute unfair competition or unfair,

unconscionable, deceptive or fraudulent acts, or trade practices in violation of La. Rev. Stat. Ann. §§ 51:1401 et seq.

247.    Under the statute listed above to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, Defendants are the suppliers, manufacturers, advertisers, and sellers, who are subject to liability under such legislation for unfair, deceptive, fraudulent and unconscionable consumer sales practice

248.    Defendants violated the statutes that were enacted in these states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, by knowingly and falsely representing that the Products were fit to be used for the purpose for which they were intended, when in fact the drugs were defective and dangerous, and by other acts alleged herein. These representations were made in uniform promotional materials.

249.    The actions and omissions of Defendants alleged herein are uncured or incurable deceptive acts under the statutes enacted in the states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

250.    Defendants had actual knowledge of the defective and dangerous condition of the Products and failed to take any action to cure such defective and dangerous conditions.

251.    Plaintiffs and the medical community relied upon Defendants' misrepresentations and omissions in determining which diabetes medication to use and prescribe.

252.    Defendants' deceptive, unconscionable or fraudulent representations and material omissions to patients, physicians and consumers, constituted unfair and deceptive acts and practices.

253.    By reason of the unlawful acts engaged in by Defendants, and as a direct and proximate result thereof, Plaintiffs have suffered ascertainable losses and damages.

254.    As a result of these violations of Louisiana's consumer protection laws, Plaintiff and/or Decedent incurred and will incur; serious physical injury, pain, suffering, loss of income,

loss of opportunity, loss of family and social relationships, and medical, hospital and surgical expenses and other expense related to the diagnosis and treatment and death thereof, for which Defendants are liable.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT XI:
## PUNITIVE DAMAGES

255. Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

256. Plaintiff, Dixie A. Smith, individually and as successor in interest of Jay Christopher Smith, brings Count XI of this complaint for the injuries and wrongful death of Jay Christopher Smith.

257. Plaintiff is entitled to punitive damages because Defendants' actions were reckless and without regard for the public's safety.  Defendants mislead both the medical community and the public at large, including Decedent and Decedent's physicians, by making false representation about and concealing pertinent information regarding Xarelto®.  Defendants downplayed, understated and disregarded its knowledge of the serious and permanent side effects associated with the use of Xarelto® despite information demonstrating the product was unreasonably dangerous.

258. As a proximate result of Defendants' acts and omissions, Decedent suffered internal bleeding, all resulting from Decedent's ingestion of Xarelto®.

259. Defendants' actions were performed willfully, intentionally, and with reckless

disregard for the rights of Decedent and the public.

260.    Defendants continued to promote the safety of Xarelto®, while providing to consumers no warnings or insufficient warnings about the risk of irreversible bleeding associated with it, even after Defendants knew of that risk.

261.    Defendants' conduct was committed with knowing, conscious and deliberate disregard for the rights and safety of consumers, including the Decedent, thereby entitling the Plaintiffs to punitive damages in an amount appropriate to punish the Defendants and deter them from similar conduct in the future.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT XII:
## WRONGFUL DEATH

262.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

263.    Plaintiff, Dixie A. Smith, individually and as successor in interest of Jay Christopher Smith, brings Count XII of this complaint for the wrongful death of Jay Christopher Smith

264.    Successor Plaintiffs have the right to bring the following survival action on behalf of of Jay Christopher Smith under Louisiana Statute.

265.    At all times material hereto, Defendants owed a duty to Decedent to protect Decedent against reasonably foreseeable harms that a prudent person would anticipate were likely to result from the Defendants' acts or omissions.

266.    Defendants breached that duty when they acted in the negligent and/or tortious

manner set forth in paragraphs above.

267.    Defendants' negligent and tortious conduct was the direct and proximate

cause of Decedent's death on January 23, 2014.

268.    As a direct and proximate result of the acts and/or omissions of Defendants,

Decedent's heirs and family have been deprived of his future aid, income, assistance, services,

companionship, society, affection and financial support.

269.    By reason of the foregoing, Defendants are liable to Decedent's heirs and family,

for Decedent's wrongful death, in an amount to be proven at trial.

270.    Defendants' aforementioned conduct was committed with knowing, conscious,

deliberate and malicious disregard for the rights and safety of consumers, including Decedent,

thereby entitling Decedent's heirs and family to punitive damages in an amount to be determined

at trial that is appropriate to punish Defendants and deter it from similar conduct in the future.

271.    If death had not ensued, Decedent would have been entitled to maintain a

cause of action and recover damages against Defendants because of the above alleged negligent and

tortious conduct.

272.    As a direct, foreseeable and proximate result of Defendants' conduct,

Decedent's estate has incurred medical and funeral and burial expenses.

273.    As a direct, foreseeable and proximate result of the Defendants' conduct,

Decedent's estate has been deprived of prospective net accumulations and loss of earnings.

274.    In addition, Plaintiffs demand payment for all economic losses suffered by the

Decedent's survivors, including costs of administration and other expenses reasonably associated

with the Decedent's death.

275.    The claims for Wrongful Death, Survival and/or those other claims available

under applicable law, set forth herein are hereby asserted on behalf of all persons having such claims, including Decedent's surviving children.

276.    Plaintiffs claim damages of Defendants under and by virtue of the Louisiana's Wrongful Death Statute for the pecuniary value of future services, support, society, comfort, and contribution of the Decedent that would have been rendered to the wrongful death beneficiaries for the expected remainder of their lives.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT XIII:
## SURVIVAL ACTION

277.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if set forth fully herein.

278.    As a result of the acts and omissions of Defendants, Decedent died and suffered injury, including pain, prior to his death.

279.    Plaintiff Dixie A. Smith, as the spouse of Jay Christopher Smith, is entitled to recover damages, to which Decedent would have been entitled, in an amount to be proven at trial.

280.    Defendants' aforementioned conduct was committed with knowing, conscious, deliberate and malicious disregard for the rights and safety of consumers, including Decedent, thereby warranting punitive damages in an amount to be determined at trial that is appropriate to punish Defendants and deter it from similar conduct in the future.

## COUNT XIV:
## LOSS OF CONSORTIUM

281.    Plaintiff repeats and realleges each and every allegation set forth above with the

same force and effect as if set forth fully herein.

282.   At all times relevant to this Complaint, Dixie A. Smith, the Decedent's spouse, along with Decedent's other heirs, suffered damages as the result of the loss of the injured Decedent's services, society, and consortium. As a direct and proximate result of Defendants' conduct and the defective, unsafe, and unreasonably dangerous condition of Xarelto®, Dixie A. Smith and Decedent's other heirs have been deprived of the Decedent's services, society, and consortium.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment for damages against Defendant for all damages allowable by law against Defendants together with interest, costs and attorney's fees, including but not limited to those damages provided pursuant to applicable law, set forth below, and requests a trial by jury of all issues so triable, to wit:

a)   For judgment for damages sufficient to compensate for damages, including but not limited to past, present, and future economic expenditures in connection with the injuries sustained by Decedent as a result of ingesting Defendants' Xarelto®;

b)   The value of lost support and services from the date of the Decedent's injury to the date of death, with interest, and future loss of support and services from the date of death and reduced to present value;

c)   As to the surviving spouse and heirs, individually, losses as a surviving heirs of decedent, including, for loss of companionship, protection, contribution and for mental pain and suffering from the date of injury;

d)   Medical or funeral expenses due to the decedent's injury or death may be recovered;

e)   Any and all loss of earnings of the deceased from the date of injury to the date of death, less lost support of survivors excluding contributions in kind, with interest;

f)      Loss of the prospective net accumulations of an estate, which might reasonably have been expected but for the wrongful death;

g)      Medical or funeral expenses due to the decedent's injury or death that have become a charge against the estate;

h)      Punitive damages in an amount to be awarded as provided by law;

i)      Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the plaintiffs in an amount sufficient to punish defendants and deter future similar conduct;

j)      Awarding the costs and the expenses of this litigation to the Plaintiff;

k)      Awarding the Plaintiff the cost of these proceedings;

l)      Awarding reasonable attorneys' fees and costs to the Plaintiff as provided by law;

m)      Awarding pre-judgment and post-judgment interest to the Plaintiff; and

n)      Granting all such other relief as the Court deems necessary, just and proper.

## DEMAND FOR JURY TRIAL

The Plaintiff hereby demands a trial by jury on all Counts and as to all issues.


Respectfully submitted this 22nd day of May, 2015.

By:  /s/ Neil D. Overholtz
Neil D. Overholtz
Louisiana Bar No.:  0188761
AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
17 East Main Street
Suite 200
Pensacola, FL 32502-5998
Telephone:  (850) 202-1010
Fax:  (850) 916-7449
Noverholtz@awkolaw.com

**ATTORNEYS FOR PLAINTIFFS**